UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Unisource Worldwide, Inc.,

                             Plaintiff,

                                                  Civ. No. 06-4007 (RHK/AJB)
                                                  **MEMORANDUM OPINION**
v.                                                **AND ORDER**

Richard Schroeder,

                             Defendant.

---

David A. Schooler, David M. Wilk, Melissa M. Weldon, Jennifer G. Daugherty, Larson King, LLP, St. Paul, Minnesota, for Plaintiff.

William G. Miossi, Winston & Strawn LLP, Washington, DC, John M. Dickman, Tiana F. Nell, Winston & Strawn LLP, Chicago, Illinois, James J. Long, Briggs and Morgan PA, Minneapolis, Minnesota, for Defendant.

---

## INTRODUCTION

      Plaintiff Unisource Worldwide, Inc. ("Unisource") has sued its former employee, Defendant Richard Schroeder, to enforce a non-competition agreement and for alleged misappropriation of trade secrets. Before the Court is Unisource's Motion for a Temporary Restraining Order. Because Schroeder received notice of Unisource's Motion and the Motion was fully briefed and heard by the Court, it will be construed as a Motion

for a preliminary injunction.  See Fed. R. Civ. P. 65(a).  For the reasons set forth below, the Court will deny the Motion.[1]

## BACKGROUND

In 1991, Schroeder accepted a sales position with Packaging Consultants and Supply, Inc. ("PC").  (Schroeder Decl. ¶ 4.)  When hired, he signed an employment agreement that governed the terms of his employment with PC (the "PC Agreement").  (Id. ¶ 5; Schooler Aff. Ex. A.)  The PC Agreement incorporated a commission schedule whereby Schroeder received a 40% commission on his sales and also contained a "Non-compete Agreement."  (Schooler Aff. Ex. A.)  The Non-compete Agreement prohibited Schroeder, for one year after he left PC, from conducting or doing business with any Unisource customer whom he had called upon during his last year of employment.  (Id.)

In late 1995 or early 1996, Unisource[2] acquired PC and Schroeder continued to work as a sales representative with Unisource.  (Schooler Aff. Ex. S; Schroeder Decl. ¶ 6.)  According to Schroeder, "[n]o one from PC or [Unisource] advised him that the PC Agreement was terminated, nor was any request made of [him] to modify the terms of the PC Agreement."  (Schroeder Decl. ¶ 6.)

---

[1] The following constitutes the Court's findings of fact and conclusions of law as required by the Federal Rules of Civil Procedure 52(a).

[2] Unisource markets and distributes commercial printing and business imaging papers, packaging systems, and facility supplies and equipment in North America.  (Niblo Aff. ¶ 1.)

2

Shortly before May 31, 1996, Schroeder presented to his superiors his "concern with possible future changes with Unisource" and indicated to them that he had been offered a position with another company "with a three year guarantee." (Schooler Aff. Ex. V.) In response, Unisource, on June 28, 1996, provided Schroeder with a hand-written document that guaranteed that "[f]or the years 1996 and 1997 . . . [his] gross commissions [would] not be less than $100,000." (Id. Ex. W.)

Between 1996 and April 1, 1999, Unisource paid Schroeder in accordance with the commissions schedule applicable to all of its sales representatives; under that schedule, Schroeder received a 35% commission on his sales. (Kawell Aff. ¶ 2; Schooler Aff. Ex. D; LeBlanc Aff. ¶ 2.) In 1999, Schroeder began to dispute the 35% commission rate he was being paid and asserted that he was entitled the 40% commission rate outlined in the PC Agreement. (Kawell Aff. ¶ 2; Schroeder Decl. ¶ 7; LeBlanc Aff. ¶ 3.) He claimed that because he was paid a 35% commission instead of a 40% commission between 1996 and 1999, he had been denied $73,170.08 in commissions that he had earned. (Kawell Aff. ¶ 2; Schroeder Decl. ¶ 7; LeBlanc Aff. ¶ 3; Schooler Aff. Ex. B.) On March 15, 1999, he sent a letter to his supervisor, Gib Willson, seeking payment of the $73,170.08 to which he believed he was entitled. (Schooler Aff. Ex. B.) Schroeder's letter also provided:

> . . .
> To move forward I need:
> 1.    Guarantee of 35% commission.
> . . .
> 4.    No loads or service charges will be added to orders to increase [Unisource's] portion of the revenue.
> . . .

3

>    6.    Any modifications or changes to this agreement made by Unisource and not agreed to by me will render the non-compete portion of the contract null and void.

(Id.)

Unisource disagreed with Schroeder's claim that he was entitled to the commission rates set forth in the PC Agreement. (Mathisen Aff. ¶ 5.) However, "[b]ecause [he] was a valued sales representative," it agreed to pay him the $73,170.08. (LeBlanc Aff. ¶ 3.) On March 26, 1999, Keith LeBlanc, Unisource's Vice President of Supply Systems, sent Schroeder a letter (the "letter agreement"), which provided in part:

>    1.    You have requested three years['] back pay of $73,383.08[3] (to be verified by finance) as the difference between the commission rate in effect at the time of your employment agreement (40%) and the current rate (35%) which went into effect later.
>
>    2.    You agree that going forward the following rates apply:
>
>    3.    35% commission
>    . . .
>
>    6.    No loads or service charges will be added to orders to increase Unisource's portion of the revenue.
>    . . .
>
>    8.    No changes to this clarification will be made by either party without discussion and agreement.
>
>    9.    You agree to sign a non-compete agreement.

---

[3]A hand-written note to this letter changed the amount of back pay from $73,170.08. The parties have not explained the reasons for this discrepancy.

    10.      You agree to payment of the difference, once verified, through a 40% commission rate effective immediately until full payment is made. Upon reaching full payment, you will revert to the terms under point 2.

    11.      Rick, you also agree that this satisfies all you[r] concerns over changes to the employment agreement with Packaging Consultants, Inc.

(Schooler Aff. Ex. C.) On April 1, 1999, LeBlanc and Schroeder each signed the letter. (Id.)

On June 4, 1999, Schroeder and Willson executed a "Unisource Non-Competition Agreement" (the "non-Compete Agreement"), which had been called for in Unisource's June 1, 1999 letter to Schroeder. (Schooler Aff. Ex. E.) The non-Compete Agreement provided:

    2.      <u>Non-Compete Obligations.</u> For a period of twelve months following any termination of my employment with Unisource, I will not, directly or indirectly, for myself or on behalf of any person or business,

        (a)      solicit, sell to, provide service for or in any way do business with any of the customers or accounts assigned to me . . . during the twelve month period preceding the date of termination of my employment with Unisource in any of the product lines offered by Unisource to such customers or accounts during such twelve month period, or

        (b)      induce or encourage any employee of Unisource to leave the employment of Unisource or otherwise solicit or hire any such employee.

(Id.)

The 1999 letter agreement, including the June 4, 1999 non-Compete Agreement, governed the parties' employment relationship until March 2002. On March 4, 2002, Unisource's Area Vice President of Printing Paper, Michael Mathisen, notified

5

Unisource's Minneapolis group employees, including Schroeder, that Unisource was implementing a 2% "load" on all "indirect orders." (Mathisen Aff. ¶¶ 1, 3; Schooler Aff. Ex. G.) On May 28, 2002, Schroeder sent a letter to Willson in which he stated: "[a]s you are aware I have an employment agreement with Unisource (copy enclosed). The recent implementation of a 2% load and Matrix Commission system appears to be inconsistent with my agreement." (Schooler Aff. Ex. H.) Sometime in June or July, Schroeder met with Mathisen and Willson. According to Mathisen, at that meeting "Schroeder continued to contend that Unisource was bound by the 1991 agreement, [and Mathisen] told Schroeder that he would be receiving a letter in which Unisource triggered the termination provision of that agreement." (Mathisen Aff. ¶ 8.) Schroeder's notes of the meeting state that "[Mathisen] said he was canceling all employment agreements and would have a letter indicating it within two or three days." (Schroeder Decl. Ex. 1.) On July 31, 2002, Mathisen responded in a letter to Schroeder, which provided:

> This letter is in response to your letter addressed to Gib Willson and our conversation regarding the company's earlier announcement concerning the implementation of a new commission structure. In your letter you [referred to] the employment agreement between yourself and Packaging Consultants and Supply, Inc.[,] now Unisource (the "Agreement").
>
> With this letter, the company is providing you with [a] 30 day prior written notice that this Agreement is being terminated pursuant to its terms. Accordingly, the Agreement will terminate effective September 1, 2002.
>
> Although the Company is terminating this Agreement, Unisource is not terminating your employment. After September 1, 2002 your employment will be continued, at-will, consistent with the then current policies and procedures, which are subject to change without notice.

(Smith Aff. Ex. I.)

On August 11, 2006, one of Schroeder's largest accounts, Entegris, requested a cost savings analysis of its business with Unisource. (Niblo Aff. ¶ 18.) Unisource prepared a Cost Savings Report (the "Report")[4], which took approximately one month to research. (Id.) The Report is marked "confidential" at the bottom of each page and, according to Unisource, contains confidential information and trade secrets. (See Niblo Aff. ¶¶ 12-20.)

On September 13, 2006, Schroeder was provided with a hard copy of the Report and electronic access to it through a secure server. (Id. ¶ 28.) Schroeder accessed the electronic version of the Report several times. (Id.)

On September 22, 2006, Schroeder accepted a position with Midland Paper Company[5] ("Midland") and resigned from his position with Unisource. (Schroeder Decl. ¶ 15; Schooler Aff. Ex. M.) In his resignation letter, Schroeder stated that he had returned all of the Unisource property previously furnished to him. (Schooler Aff. Ex. M.) In his sworn Declaration, he asserts that he has not retained any Unisource documents or disclosed the contents of Unisource documents to third parties. (Schroeder Decl. ¶ 19.) Unisource alleges that its employees searched Schroeder's desk for the Report and failed to find it. (Niblo Aff. ¶ 31.)

---

[4] During oral argument, Unisource provided the Court with a copy of the Report.

[5] Midland is a midwest distributor of paper and packaging supplies with locations in Illinois, Wisconsin, and Minnesota. (Schroeder Decl. ¶ 16.)

On the same day that Schroeder resigned, he made a job offer to fellow Unisource employee Randy Heckman to work at Midland; Heckman accepted the offer the following day. (Id. ¶ 29.) Since Schroeder's resignation, two of his clients have closed their accounts with Unisource and taken their business to Midland. (Id. ¶ 33.) Unisource alleges that "[t]he biggest potential threat to Unisource, however, remains the possible loss of Entegris' business" and that Schroeder is now using the Report to pursue it. (Id. ¶ 34.) Schroeder denies having the Report or using it in any way to solicit or retain the Entegris business. (Schroeder Decl. ¶¶ 18-20.)

**STANDARD OF DECISION**

Whether a preliminary injunction should be granted depends on an evaluation of the following factors: (1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest. Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981); see Watkins, Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003). "When applying the Dataphase factors . . . a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999). The party requesting injunctive relief bears the "complete burden" of proving all of the factors listed above. Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987).

**ANALYSIS**

Unisource contends that it is entitled to a preliminary injunction that would prohibit Schroeder from engaging in business with his former clients. Its contention is based on the specific terms of the June 4, 1999 non-Compete Agreement, which prevents Schroeder from conducting business with any entities that he had conducted business with during his last year of employment with Unisource. Unisource also seeks injunctive relief barring Schroeder from using the Cost Savings Report. The Court determines that Unisource has failed to carry its burden of proving the required four Dataphase factors and will deny both requests for injunctive relief.

**I.     Likelihood of Success**

The Court determines that Unisource has failed to demonstrate that it is likely to succeed on either of its claims. "A preliminary injunction will only be issued where it appears that the petitioner is likely to succeed on the merits in proving that a permanent injunction is warranted." In re Y & A Group Sec. Litig., 38 F.3d 380, 383 (8th Cir. 1994). Accordingly, "[if] a plaintiff's legal theory has no likelihood of success on the merits, preliminary injunctive relief must be denied." Newton County Wildlife Ass'n v. U.S. Forest Serv., 113 F.3d 110, 113 (8th Cir. 1997) (citing Pottgen v. Mo. State High Sch. Activities Ass'n, 40 F.3d 926, 931 (8th Cir. 1994)).

   **A.     Non-Compete Agreement**

Unisource relies exclusively on the June 4, 1999 non-Compete Agreement as support for its assertion that Schroeder should be prohibited from conducting business with

his former clients. (Mem. in Supp. at 15; Schooler Aff. Ex. E.) Unisource, however, has failed to establish that the non-Compete Agreement was binding on Schroeder at the time he resigned, because Mathisen's 2002 letter terminated Schroeder's "agreement" and stated that his future employment with the company would be "at-will." (Schooler Aff. Ex. I.)

Unisource argues that, because Mathisen's letter refers to the "employment agreement between [Schroeder] and Packaging Consultants and Supply, Inc.," it did not terminate Schroeder's obligations under the 1999 agreement, including his non-Compete Agreement, which was executed by both parties at approximately the same time. (Reply Mem. at 16-17.) The Court rejects Unisource's argument for three reasons.

First, Mathisen's July 31, 2002 letter was written in response to Schroeder's claim that Unisource's "2% load and Matrix Commission system appear[ed] to be inconsistent with [his] agreement." (Schooler Aff. Ex. H.) Only Schroeder's 1999 letter agreement prohibited Unisource from imposing "loads" on its portion of the revenue. (Schooler Aff. Ex. C). His 1991 agreement, however, had no such provision. (Schooler Aff. Ex. A.) Accordingly, Mathisen's letter can only be directed at Schroeder's 1999 letter agreement.

Second, Mathisen states that:

> . . . [he] advised Schroeder that Unisource was modifying its compensation commission schedule. In the past, there had been certain exceptions to the commission schedule for sales people, including the commission schedule that was effective for Schroeder. This was primarily the result of Unisource acquiring other companies that had differing commission schedules. [He] advised Schroeder that there would no longer be any exceptions to the commission schedule and that all sales people, including Schroeder, would be bound by the new commission schedule effective March 11, 2002. [He] explained how the commission schedule would work and its implications for Schroeder's business. The purpose of the meeting was to

>discuss this change in commission schedule pursuant to paragraph 8 of the March 26, 1999 memo from Keith LeBlanc to Rick Schroeder.

(Mathisen Aff. ¶ 7.)  Accordingly, the termination was implemented in order to create uniformity among the sales representatives and, therefore, was clearly directed at the 1999 letter agreement.

Third, Mathisen's letter provided that Schroeder's future employment conditions would be "subject to change without notice."  (Schooler Aff. Ex. I.)  Schroeder's 1999 letter agreement, however, could not be changed "by either party without discussion and agreement."  (Schooler Aff. Ex. C.)  Accordingly, Mathisen's letter can only be read to refer to, and to terminate, Schroeder's 1999 letter agreement.

Unisource next argues that, even if Mathisen's letter terminated the 1999 letter agreement, it did not terminate the non-Compete Agreement because that was a separate, stand-alone contract that was supported by independent consideration.  In support of this argument, Unisource asserts that "Schroeder would not accept the non-Compete Agreement that other sales representatives were signing"[6] and that "the parties negotiated at arm's length" for Schroeder's non-Compete agreement.  (Reply Mem. at 11.)  This argument fails for two reasons.

First, there is no independent consideration for the non-Compete Agreement.  The non-Compete Agreement provides that the consideration is "[Schroeder's] employment

---

[6] The employment agreement signed by Unisource's other sales representatives contains a more restrictive non-Compete clause than Schroeder's non-Compete Agreement.  (See Schooler Supp. Aff. Ex. AA.)

11

with Unisource and the compensation paid or to be paid to [him]." (Schooler Aff. Ex. E.) The "compensation paid" included benefits already provided to him in the 1999 letter agreement: a new commission rate – including a requirement that Unisource could not implement "loads" – and payment of the disputed $73,383.08 in commissions. Accordingly, there is no independent consideration of the non-Compete Agreement.

Second, even if the Court were to assume *arguendo* that Schroeder had negotiated with Unisource for a more favorable non-Compete Agreement, the Court would still conclude that his non-Compete Agreement is not a separate, independent agreement from his 1999 letter agreement. The 1999 letter agreement required Schroeder to "sign a new non-compete agreement." (Schooler Aff. Ex. C.) Schroeder's negotiation of a more favorable non-Compete Agreement, therefore, merely fulfilled an agreed upon term of the letter agreement and cannot constitute a new, independent agreement.

For the these reasons, the Court determines that Willson's letter terminating the 1999 letter agreement also terminated the non-Compete Agreement. With no non-Compete Agreement in effect, Unisource cannot establish a violation of its agreement and cannot rely upon the non-Compete Agreement as support for its request for injunctive relief.[7]

---

[7]Even if the Court were to determine that Mathisen's July 31, 2002 letter revoked only Schroeder's PC Agreement, the Court would still reach the same conclusion. The parties' letter agreement dealt only with Schroeder's commission rate and non-competition obligations. The letter is entitled a "Compensation Clarification" and provides that "no changes to this clarification will be made by either party without discussion and agreement." (Schooler Aff. Ex. C.) The letter also states that "this satisfies all

### B.     Misappropriation of Trade Secrets & Unfair Competition

Unisource also argues that Schroeder misappropriated trade secrets and engaged in unfair competition because he failed to return the Cost Savings Report and other Unisource documents when he resigned. (See Mem. in Supp. at 18-22.) Unisource has provided evidence that it presented Schroeder with various documents and that, when Schroeder resigned, it was unable to locate those documents. Schroeder, however, has stated that he does not possess any of Unisource's documents, that he can no longer access the computer system which contains the electronic files of those documents, and that he cannot remember the information contained in the reports. (Schroeder Decl. ¶¶ 19-21, 24, 27.) Unisource has not rebutted these arguments, nor has it presented any evidence to the Court that Schroeder has used or referred to these documents or its contents in his current position with Midland.

Accordingly, the Court determines Unisource has not met its burden of establishing that it is likely to succeed in proving that Schroeder misappropriated trade secrets or engaged in unfair competition.

## II.     Irreparable Harm

"The basis of injunctive relief in the federal courts has always been irreparable harm and the inadequacy of legal remedies. Thus, to warrant . . . preliminary [injunctive relief],

---

[Schroeder's] concerns over changes to the employment agreement with Packaging Consultants, Inc." (Id.) Accordingly the letter agreement can only reasonably be viewed as an amendment to the PC Agreement and Unisource's termination of the PC Agreement also terminated the letter agreement.

the moving party must demonstrate a sufficient threat of irreparable harm." Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924, 926 (8th Cir 1999) (internal quotation omitted); accord In re Travel Agency Comm'n Antitrust Litig., 989 F. Supp. 685, 689 (D. Minn. 1995) ("[A]n injunction cannot issue based on imagined consequences of an alleged wrong. Instead, there must be a showing of imminent irreparable injury."). "Economic loss does not, in and of itself, constitute irreparable harm. . . . Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the [petitioner's] business." Packard Elevator v. I.C.C., 782 F.2d 112, 115 (8th Cir. 1986) (citations omitted).

Unisource argues that, if Schroeder continues to solicit business from his former clients, it will be irreparably harmed because it will lose the goodwill of those customers. (Mem. in Supp. at 14-15.)  Unisource supports this argument with evidence that Schroeder developed his sales skills through experience and training, each provided by Unisource. (Mem. in Supp. at 15.)  Unisource, however, claims that it will lose Schroeder's previous clients and that the "biggest potential threat" to it "remains the possible loss of Entegris' business, especially in light of the Cost Savings Report that Schroeder misappropriated." (Mem. in Supp. at 11-12; Niblo Aff. ¶ 34.)  If Unisource loses Schroeder's previous clients by wrongdoing on Schroeder's part, Unisource may obtain monetary damages for such losses.  At this time, Unisource has failed to proffer any evidence that the loss of such contracts threatens Unisource's "very existence" such that a future action for monetary

damages would be insufficient. Accordingly, the Court determines that Unisource has not established that it is subject to irreparable harm.

### III.     Balance of Harms and Public Policy

Unisource has failed to establish that the balance of harm between the parties and the public interest weigh in favor of granting a preliminary injunction. To establish that the balance of harm weighs in its favor, Unisource argues that it will be harmed if Schroeder is allowed to continually solicit business from his former clients because he has confidential information about Unisource's business practices. (Mem. in Supp. at 22.) This argument, however, relies on the ground that Schroeder possesses and will use such confidential information. As the Court has explained above, Unisource has failed to establish either possession or use.

Unisource also argues that public policy favors a ruling in its favor because the non-Compete provision is a valid contract. Public policy favors upholding valid restrictive covenants and restraining unfair competition. Millard v. Elec. Cable Specialists, 790 F. Supp. 857, 858, 863 (D. Minn. 1992). As the Court has explained above, the restrictive covenant at issue was expressly revoked by Unisource in 2002.

In the alternative, Schroeder has proffered a valid public policy concern against prohibiting him from soliciting business from his former clients–a customer's freedom of choice. Absent a valid restrictive covenant, public policy supports the freedom for customers to choose with whom they will deal. See Raymond James & Assoc. v. Leonard & Co., 411 F. Supp. 2d 689, 695 (E.D. Mich. 2002) ("[t]o enjoin the employee from

15

providing services would unnecessarily infringe on the customer's exercise of choice in the person with whom the customer deals"). Accordingly, the Court determines that Unisource has failed to establish that public policy warrants enforcement of their Motion for a Preliminary Injunction.

IV.     Summary

In sum, Unisource has failed to carry its burden under <u>Dataphase</u> and is not entitled to a preliminary injunction against Schroeder.

## CONCLUSION

Based upon the foregoing, and on all of the files, records and proceedings herein, **IT IS ORDERED** that Plaintiff Unisource's Motion for a Temporary Restraining Order (Doc. No. 3), which the Court construes as a motion for a preliminary injunction, is **DENIED**.


Dated: October  23 , 2006                             s/Richard H. Kyle
                                                      RICHARD H. KYLE
                                                      United States District Judge